

**ORIGINAL**

FILED
APR 0 4 2002
PER _____
HARRISBURG, PA DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER LEWIS, <br>       Plaintiff | : CIVIL ACTION - LAW |
| v. | : NO. CV 00-0436 |
| DOMINICK DEROSE, MARK JESZENKA, MICHAEL HOHNEY, ROBERT DRUM, MR. SHOEMAKER CARL GARVER, and DAUPHIN COUNTY, <br>       Defendants | : JUDGE RAMBO ✓ <br> : MAGISTRATE JUDGE SMYSER <br> : JURY TRIAL DEMANDED |

## DEFENDANTS' SUPPLEMENTAL STATEMENT OF UNDISPUTED MATERIAL FACTS

1-197. Defendants incorporate by reference the averments of paragraphs 1-197 of their Concise Statement of Undisputed Material Facts filed of record on May 7, 2001, as if fully set forth at length herein.

198. In his original affidavit dated May 3, 2001, Warden DeRose stated at paragraph 31 that Christopher Lewis' back pay was not refused when he returned to work at the Prison. DeRose further indicated that there were numerous letters and conversations among Mr. Lewis, Union Business Agent Charles Shugart, and himself in an effort to compute the proper amount of back wages to be provided to Mr. Lewis. DeRose also indicated that Mr. Lewis initially disputed these findings and proposed payments and that the matters were under negotiation for some period of time. In fact, throughout the entire period of negotiations, Mr. Lewis continually challenged DeRose's calculations and his proposed payment. DeRose's purpose here is to clarify in greater detail the nature of the disputes and the chronology of the negotiations that led to the compromise resolution of these matters. (DeRose Second Supp. Aff. par. 1).

199. Upon Mr. Lewis' return to work in late January, 2000, computing the back wages owed to him during the period of suspension was not a simple matter of just calculating the amount of wages owed to him for that time period at straight time based upon a normal work week. Rather, these calculations also included issues concerning entitlement to

and calculation of leave time pay, overtime pay, holiday pay, and training pay as well as deductions for any wages and unemployment compensation received during the period of suspension. After his return to work, Mr. Lewis had raised issues concerning his alleged entitlement to payment for these items during his period of suspension. He also initially refused to provide a W-2 wage form for employment that he had during his period of suspension. (DeRose Second Supp. Aff. par. 2; Exhibit "A").

200. Thereafter, DeRose further reviewed and researched these matters and drafted a memorandum concerning adjustments to those items claimed by Mr. Lewis for back wage reimbursement that DeRose felt were proper and justified. That memorandum also addressed the issue of health benefits on page 3. The applicable section indicated that if Mr. Lewis had any out of pocket medical expenses during this period of his suspension, they would be reimbursed at the rate appropriate for his health care coverage. DeRose then forwarded this memorandum by correspondence of February 24, 2000 to Charles Shugart, the Union representative, who was involved in negotiation of these items, for his review. (DeRose Second Supp. Aff. par. 3; Exhibits "B" and "C").

201. As of the time of DeRose's February 24, 2000 letter (Exhibit "C") Mr. Lewis was again no longer actively employed at the prison. After his return from suspension, on or about February 14, 2000, he claimed that a stress-related medical condition prevented him from working at the prison, and he has not returned to duty since that date. (DeRose Second Supp. Aff. par. 4).

202. As of February 2000, there was pending a grievance number 59597 dated 7/14/99 pertaining to these matters which had previously been filed by Christopher Lewis and which states as follows:

> "I am grieving that I had been suspended without pay on July 12, 1999. I had been accused of erasing the file in the Captain's office. I am requesting a hearing and all monies lost in back pay and in benefits owed to me."

That grievance was also signed by Charles Shugart, the Union representative, as well as by Mr. Lewis. (DeRose Second Supp. Aff. par. 5; Exhibit "D").

203. DeRose then received correspondence of February 25, 2000 in response to his draft memorandum (Exhibit "B") which was signed by both Charles Shugart and by Christopher Lewis. While many of the items that

4

DeRose discussed in his memorandum were agreed to by Mr. Shugart and Mr. Lewis, there still remained several unresolved issues. Specifically, these issues pertain to alleged entitlement to back pay for training time, a credit of seven (7) vacation days and five (5) sick days that Mr. Lewis and Mr. Shugart claimed he would have earned between July 11, 1999 and January 9, 2000, as well as applicable deductions for wages and unemployment compensation received during the period of suspension. Mr. Shugart and Mr. Lewis also did not agree that this settlement should include resolution of a prior three (3) day suspension for sleeping on duty which DeRose had proposed in his memorandum (Exhibit "B"). The letter did indicate that Mr. Lewis was under an HMO (County provided) and as such, would not have had any "out of pocket" costs for medical services. It was agreed to resolve this issue as outlined in DeRose's memorandum with the understanding that all of Mr. Lewis' medical bills would be paid in full. Finally, the letter specifically indicates as follows:

> "Any corrections to the draft settlement must be mutually agreed upon prior to the final settlement of this matter. The signatures of the County and grievant will settle all issues, discipline or other matters related to this incident and proposal."

Based upon this paragraph from the letter from Mr. Shugart and Mr. Lewis, DeRose understood that final settlement of the matter could not occur until any corrections to the draft settlement document were mutually agreed upon between Lewis, the Union, and the County. (DeRose Second Supp. Aff. par. 6; Exhibit "E").

204. DeRose then responded to the letter of February 25, 2000 from Mr. Lewis and Mr. Shugart (Exhibit "E") by letter of March 6, 2000 addressed to Mr. Shugart and copied to Christopher Lewis. This letter, in essence, states that with respect to the back pay matter, the remaining issues were alleged entitlement to back pay for training time and leave time carry over. DeRose's letter also notes that the prior suspension for the other matter would be handled in accordance with the established procedures and would not be part of the settlement. Finally, DeRose's letter notes that with regard to the health benefits issue, as of March 6, 2000, Mr. Lewis had produced two (2) receipts from health care providers which would be forwarded to "Personnel" (the County Personnel Office) for processing and would be completed in accordance with Mr. Lewis' medical plan. To DeRose's knowledge, those receipts were forwarded to

the County Personnel Office for processing. After having been returned to duty from his suspension, Mr. Lewis was again not reporting for active duty at this time due to "health problems". Therefore, DeRose's letter also stated, with regard to the health benefits issue, that Mr. Lewis was again being carried on inactive status as of February 14, 2000. It also indicated that as of that time, Officer Lewis had not applied for Family Medical Leave. It is DeRose's understanding that, subsequently, Mr. Lewis did apply for Family Medical Leave after the date of DeRose's letter. (DeRose Second Supp. Aff. par. 7; Exhibit "F").

205. After his correspondence of March 6, 2000 to Mr. Shugart (Exhibit "F"), DeRose continued to negotiate the remaining issues with Shugart. Ultimately, by March 21, 2000, the parties had tentatively resolved two of the remaining issues. The resolution that was ultimately agreed to by both sides was that there would be no payment for training hours in 1999; however, on the leave time issue, Mr. Lewis would be paid for five (5) sick days and one (1) vacation day. In this regard, Mr. Lewis had originally claimed seven (7) vacation days and five (5) leave days

7

which the County did not believe that he was entitled to claim. (DeRose Second Supp. Aff. par. 8).

206. At that time, there also still remained an issue of the deduction calculation from the amount due to Mr. Lewis because of monies received by him from Unemployment Compensation and from other employment during the period of his suspension. Along these lines DeRose received correspondence dated March 21, 2000 from Mr. Shugart which included a proposed settlement agreement signed by Mr. Lewis. The proposed settlement amount was $19,869.20 which did not include the allowable deductions for wage and unemployment compensation received. (DeRose Second Supp. Aff. par. 9; Exhibit "G").

207. Wage information that was ultimately provided to DeRose indicated that Mr. Lewis had earned/received $644.70 in wages from other employers during his period of suspension in 1999 and $2,406.00 in unemployment compensation during that period. Subtracting those figures from the $19,869.20 figure, leaves a total of $16,818;.50, the amount ultimately agreed to by the parties. (DeRose Second Supp. Aff. par. 10).

8

208. There also remained a dispute concerning the language of the Release Agreement. DeRose believes that the proposed draft of the agreement that was forwarded to him on March 21, 2000 by Mr. Shugart was different from what had been previously agreed to between them. It also contained an incorrect figure due of $19,869.20. DeRose then forwarded correspondence of April 19, 2000 to Mr. Shugart along with what DeRose considered to be the final agreement and a spread sheet showing the basis for calculation of the final figure due of $16,818.50. (DeRose Second Supp. Aff. par 11; Exhibit "H").

209. While a check had been cut for payment of the amount due of $16,818.50 since March 24, 2000, it could not be disbursed until there was agreement by the parties to the language of the settlement agreement and to the amount due. As previously indicated, the letter of February 25, 2000 signed by both Mr. Lewis and Mr. Shugart also stated that:

> "Any corrections to the draft settlement must be mutually agreed upon prior to the final settlement of this matter."

(DeRose Second Supp. Aff. par. 12; Exhibit "E").

210. Thereafter, DeRose received a further memorandum from Mr. Shugart indicating that the proposed language in paragraph 14 of the settlement agreement was not satisfactory to Mr. Lewis and his attorney. (DeRose Second Supp. Aff. par. 13; Exhibit "I").

211. Ultimately, after further negotiation, the specific language of the final paragraph of the settlement agreement (paragraph 14) was agreed to between the attorneys for the County and the attorney for Mr. Lewis. The agreement was signed by Mr. Shugart and Mr. Lewis on May 11, 2000 and by DeRose on May 15, 2000. DeRose had the original signed settlement agreement and the payroll check for the amount due under the agreement hand delivered to Mr. Shugart on May 15, 2000. (DeRose Second Supp. Aff. par. 14; Exhibit "J").

212. The settlement agreement specifically addresses both the issue of reimbursement of medical expenses to Mr. Lewis in paragraph 11 and in paragraph 14 indicates that it settles and resolves all matters raised in Grievance Number 59597. That Grievance specifically referenced "all monies lost in back pay and in benefits owed to me." (DeRose Second Supp. Aff. par. 15; Exhibits "D" and "J").

213. At no time did DeRose ever direct, advise, or suggest either directly or indirectly, either before or after completion of the settlement agreement that payment of medical expenses incurred by Mr. Lewis either not be paid or that there be any delay in their processing and payment. In fact, from the start, DeRose's initial memorandum specifically recognized that medical expenses that were incurred during the period of suspension would be submitted and would be reimbursed at the applicable rate by the County. (DeRose Second Supp. Aff. par. 16; Exhibits "A" and "J").

214. DeRose also was not in any way involved in any claimed delay in the re-enrollment of Mr. Lewis for medical benefits upon his return from suspension. In this regard, DeRose specifically recalls calling Sharon Manton, Director of Personnel for the County, in February 2000 to confirm that the necessary paperwork had been completed from her office to again enroll Mr. Lewis for his benefits. (DeRose Second Supp. Aff. par. 17).

215. Sharon Manton is currently employed as the Director of Personnel and Payroll for the County of Dauphin and has held that position since January 6, 2000. (Manton Dec. par. 1).

216. The Personnel and Payroll Department oversees and coordinates the various employee medical benefits programs, including dental, vision and prescription benefits and health insurance coverage for eligible County employees. (Manton Dec. par. 2).

217. On January 20, 2000, Deputy Warden DeWees submitted a personnel action form indicating that Christopher Lewis, an employee at the prison, was returning from a suspension effective January 23, 2000. After submission of that form, it would be the responsibility of Manton's Department to ensure that Mr. Lewis was re-enrolled with the applicable benefits programs and the Warden would not be involved in that process. (Manton Dec. par. 3; Exhibit "A").

218. On or before February 14, 2000, Manton was contacted by Warden DeRose who wanted to confirm that the prison had taken care of the necessary paperwork to reinstate Mr. Lewis' employment and have him re-enrolled for benefits. Manton then sent an e-mail to Jeannette Taylor and Willie Evans requesting that they advise the Warden if there was anything further which needed to be done to accomplish this. (Manton Dec. par. 4; Exhibit "B").

219. On February 15, 2000, Manton received an e-mail response from Willie Evans responding to her February 14, 2000 e-mail inquiry. Manton was advised by Mr. Evans that Christopher Lewis was completing the enrollment benefit applications and he would also forward any bills he incurred during the time he was suspended from employment (July 12, 1999 – January 23, 2000). (Manton Dec. par. 5; Exhibit "C").

220. On February 15, 1999 [sic], Mr. Lewis submitted a memo to the Warden indicating that he was submitting the forms to have his insurance coverages reinstated. That memo also indicated that Mr. Lewis had spoken with Willie Evans who advised that all pre-existing conditions would be covered. (Manton Dec. par. 6; Exhibit "D").

221. On February 14, 2000, Christopher Lewis requested worker's compensation/administrative leave due to alleged job-related stress. The County's worker's compensation carrier was notified of this claim via the Employer's Report of Occupational Injury or Disease Form. On February 17, 2000, the carrier issued a Notice of Worker's Compensation Denial to Mr. Lewis indicating that he did not suffer a compensable, work-related injury. (Manton Dec. par. 7).

222. On or about February 17, 2000, the change in enrollment documents were submitted to Delta Dental, National Prescription Administrator and Keystone Health Plan Central to reinstate the dental, prescription, vision and medical coverages for Christopher Lewis and his dependents with an effective date of February 1, 2000. (Manton Dec. par. 8).

223. On February 24, 2000, a personnel action form was submitted indicating that Mr. Lewis was absent without leave since February 14, 2000 and that Mr. Lewis was offered Family Medical Leave which was refused. (Manton Dec. par. 9; Exhibit "E").

224. Since Mr. Lewis was in a non-compensable status and since he had refused to apply for Family Medical Leave, the County ceased paying for his health benefits as of March 1, 2000. Mr. Lewis was sent correspondence dated March 7, 2000 advising Mr. Lewis of his option to continue his health benefits, for up to eighteen (18) months. (Manton Dec. par. 10; Exhibit "F").

225. On April 11, 2000, Willie Evans, Benefits Coordinator, sent Mr. Lewis' outstanding medical and dental bills to Marie Rebuck, County

Controller, for payment. Those invoices were for services provided on November 24, 1999, December 28, 1999 and January 27, 2000. The County Controller's office cut checks on April 20, 2000 which were mailed to the providers on April 24, 2000. (Manton Dec. par. 11; Exhibit "G").

226. By correspondence dated April 13, 2000, Mr. Lewis was advised as to his options with respect to his health benefit and was requested to advise me within five (5) days whether he wished to use Family and Medical Leave or to continue in an unpaid leave status. (Manton Dec. par. 12; Exhibit "H").

227. On April 21, 2000, Mr. Lewis requested Family and Medical Leave commencing on April 13, 2000. Mr. Lewis had previously declined Family and Medical Leave due to possible adverse consequences on his pending worker's compensation claim. Mr. Lewis further indicated that he had not incurred any medical expenses during the month of March, 2000 and that the Family and Medical Leave should commence from the date of Manton's April 13, 2000 letter. (Manton Dec. par. 13).

228. On May 2, 2000, a personnel action form was submitted returning Mr. Lewis from general medical leave effective April 12, 2000

and placing him on Family and Medical Leave effective April 13, 2000. (Manton Dec. par. 14; Exhibit "I").

229. On July 17, 2000, Manton confirmed that Delta Dental was notified on the June, 2000 eligibility report to restore Mr. Lewis' benefits back to April, but Delta Dental did not update their system until July 14, 2000 to reflect that change. (Manton Dec. par. 15; Exhibit "J").

230. On July 19, 2000, a personnel action form was submitted reflecting that Mr. Lewis returned from family medical leave effective July 6, 2000 and was placed on medical leave of absence effective July 6, 2000. (Manton Dec. par. 16).

231. All of the foregoing changes in employment status and/or eligibility for benefits were handled in accordance with the Personnel and Payroll Department's standard operating procedures with respect to the administration of employee benefits programs. (Manton Dec. par. 17).

232. What happened in this case was that over the course of twelve weeks, Plaintiff was brought back from suspension, left again without applying for Family and Medical Leave, and then reconsidered and applied for Family and Medical Leave benefits. Any delays and/or

problems which occurred were due to Mr. Lewis' frequent changes in employment status and not due to any involvement of the Warden in the benefits process. (Manton Dec. par. 18).

233. Warden DeRose never in any way interfered with, obstructed or did anything to delay the processing of Christopher Lewis' re-enrollment for benefits, or with respect to reimbursement of Mr. Lewis for medical expenses incurred during his period of suspension. In fact, to my knowledge, the Warden's only involvement with Mr. Lewis' re-enrollment for benefits was his phone call on or before February 14, 2000. (Manton Dec. par. 19).

        Respectfully submitted,

        Lavery, Faherty, Young & Patterson, P.C.

        By: _____
        Frank J. Lavery, Jr., Esquire
        Atty No. 42370
        James D. Young, Esquire
        Atty No. 53904
        225 Market Street, Suite 304
        P.O. Box 1245

DATE: 4/4/02        Harrisburg, PA 17108-1245
        Attys for Defendants

## CERTIFICATE OF SERVICE

I, Linda L. Gustin, an employee with the law firm of Lavery, Faherty, Young & Patterson, P.C., do hereby certify that on this ____4th____ day of April, 2002, I served a true and correct copy of the foregoing **Defendants' Supplemental Statement of Undisputed Material Facts** via U.S. First Class Mail, postage prepaid, addressed as follows:

Don Bailey, Esquire
4311 North Sixth Street
Harrisburg, PA  17110

_____
Linda L. Gustin